REVISED AUGUST 6, 2009

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

July 16, 2009

Charles R. Fulbruge III
Clerk

No. 08-30967

DERRELL HOLLAND,

Plaintiff - Appellee

v.

INTERNATIONAL PAPER COMPANY RETIREMENT PLAN,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Louisiana

Before KING, GARWOOD, and DAVIS, Circuit Judges.

KING, Circuit Judge:

Plaintiff Derrell Holland brings this suit against Defendant Retirement Plan of International Paper Co. alleging that he was denied disability retirement benefits in violation of provisions of the Employee Retirement Income Security Act. The Plan Administrator denied Holland's application for disability retirement benefits. The district court granted Holland relief from that denial, on the ground that the Plan Administrator abused its discretion, and awarded retirement benefits to Holland. The Retirement Plan now appeals. We reverse and remand for entry of judgment in favor of the Retirement Plan because the Plan Administrator did not abuse its discretion.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Derrell Holland worked at International Paper Co.'s mill in Bastrop, Louisiana, for over thirty-six years. During that time, he held positions of paper machine specialist, equipment operator, dispatcher, and, most recently, fire protection specialist. With the exception of the dispatcher position,[1] which he performed for about two years, Holland's positions required heavy physical exertion. On April 28, 2003, Holland suffered a myocardial infarction (heart attack), had a pacemaker inserted, and was unable to return to his position as a fire protection specialist due to the physical demands of the position. He applied for and received thirty-nine weeks of sickness and accident benefits.

He also applied for disability retirement benefits under the Retirement Plan of International Paper Co. (the "Plan"). The Plan is an employee welfare benefit plan governed by the Employee Retirement Income Security Act ("ERISA"). International Paper funds the Plan by making irrevocable, non-reversionary, periodic payments into a separate trust, from which all benefits are paid. Under the terms of the Plan, International Paper's Senior Vice President–Human Resources is the Plan Administrator. The Plan grants the Plan Administrator the discretionary power and authority "to interpret the Plan, and to resolve ambiguities, inconsistencies and omissions, which determination shall be conclusive and binding upon all persons having any interest in or under the Plan"; "to decide questions concerning the Plan and the eligibility of any Employee to participate in the plan, in accordance with the provisions of the

---

[1] Holland described the dispatcher position as having light physical requirements. International Paper's Manager–Industrial Relations, Kevin P. Doherty, however, attested that "[a]ll positions at the Louisiana Mill for which Mr. Holland may be qualified are physically demanding jobs that require numerous types of exertions and frequently changing working conditions."

Plan"; and "to determine the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan."

The Plan states that an employee "may be entitled to a disability retirement benefit under the Plan provided you meet the Plan's definition of 'totally and permanently disabled' as determined by the [P]lan [A]dministrator." The Plan defines "totally and permanently disabled":

> [A] total disability . . . is a medically determinable physical or mental impairment or diagnosed terminal illness which renders the Participant incapable of performing any occupation or employment for which the Participant is qualified by education, training or experience and which is likely to be permanent for the remainder of the Participant's life, provided the Plan Administrator finds, and a physician or physicians designated by the Plan Administrator certify, that the Participant is Disabled.

In his application for benefits, Holland stated his disability as "heart attack, pacemaker, [emphysema], leaking heart valve[,] nerve damage in back, [and] high blood pressure." He submitted medical records from several doctors, most significantly Dr. Keith Calhoun and Dr. Robert Sarama. International Paper submitted reports from two reviewing doctors, Dr. Richard Fraser and Dr. Leonard Sonne, and the report of its independent medical examiner, Dr. Godfrey Achilihu. Dr. Calhoun, Holland's primary care physician, treated Holland in the aftermath of his heart attack. In order to facilitate Holland's application for disability retirement benefits, Dr. Calhoun completed several versions of a Functional Assessment Form, in which he noted that Holland suffered a "50-60% decrease in endurance"; could stand or walk for one to three hours and sit for three to five hours in an eight-hour day; could lift ten to twenty pounds, but could lift twenty-five pounds only rarely; could use his hands for repetitive simple grasping and fine manipulation; could reach above shoulder level; could

4

bend frequently and twist, stand, sit, stoop or climb occasionally; could walk an eighth to a half mile; but could not engage in repetitive lifting, pushing, or pulling. Dr. Calhoun specified that Holland's pulmonary function was "[n]ot less than 85% of predicted." Furthermore, Holland was restricted from working near mechanical and electrical hazards. Dr. Calhoun therefore assigned Holland a Class III Impairment rating, which the form describes as a "[s]light limitation of functional capacity, capable of light work (35-55%)." Somewhat contradictorily, however, Dr. Calhoun also concluded that Holland was "totally disabled, so as to prevent him . . . from engaging in any occupation and performing any work for compensation or profit."

Holland also submitted reports from Dr. Sarama, a pulmonologist, who examined Holland on two occasions. Dr. Sarama initially noted that Holland was under no acute distress and diagnosed Holland with a significant degree of reversible airway damage. After treatment, Holland advised Dr. Sarama that he felt better, was short of breath less frequently, and was capable of increased physical exertion. Dr. Sarama also documented that Holland was "actually rebuilding his shop" due to these improvements.

After Holland submitted his application for disability retirement benefits, the Plan sent his reports to Dr. Fraser, an internist. Dr. Fraser reviewed Holland's medical records and concluded that Holland "is not capable of performing his previous work as a Fire Protection Specialist" but is "capable of performing a sedentary job with the restrictions [discussed by Dr. Calhoun]." Thus, Dr. Fraser determined that Holland was not totally disabled. Dr. Fraser did not recommend vocational rehabilitation counseling.

Based on Holland's submissions and Dr. Fraser's review, the Plan Administrator denied Holland's application on the ground that he did not meet

the definition of "totally and permanently disabled." Holland appealed for another review. The Plan Administrator then hired Dr. Sonne and Dr. Achilihu to review Holland's application. Dr. Sonne, an internist with board certification for treating pulmonary disease, reviewed Holland's medical records and concluded that "there was insufficient documentation to substantiate total disability as defined by the Plan language."

Dr. Achilihu, a cardiologist, examined Holland and determined that "from a cardiac standpoint [he did] not feel that Holland meets the definition of total disability. [He did] not feel that he is totally disabled from 'performing any occupation or employment.'" Dr. Achilihu also reported that Holland was relatively healthy, confirmed that his myocardial infarction studies were normal, and noted that his chest pain was atypical for angina. Dr. Achilihu concluded that Holland was "best suitable for work within the sedentary and/or light duty capacity with restrictions of no excessive physical exertion." Unlike Dr. Fraser, Dr. Achilihu recommended vocational rehabilitation counseling to assist Holland in seeking a new job.

The Plan Administrator then reconsidered Holland's appeal and reaffirmed its denial of benefits. It notified Holland that he had the right to file a civil action under ERISA § 502(a), 29 U.S.C. § 1132(a)(1)(B).

Holland did just that on June 22, 2005, instituting this lawsuit in the United States District Court for the Western District of Louisiana. The court referred the case to a Magistrate Judge, who issued a Report and Recommendation concluding that the Plan Administrator abused its discretion in denying Holland disability retirement benefits because the denial was not supported by substantial evidence. In particular, the Magistrate Judge concluded that the Plan Administrator lacked sufficient evidence and improperly

failed to consult a vocational expert in determining that Holland possessed the education, training, or experience required to perform sedentary or light work. The Magistrate Judge doubted whether Holland's prior job as a dispatcher "fits the true meaning of light work" and, in any case, determined that it was "unlikely that Holland would be able to perform the job of dispatcher, or any other job within [International Paper], due to the environmental restriction that he not work around mechanical or electrical hazards." Because the record did not contain evidence of other light or sedentary jobs, the Magistrate Judge recommended the conclusion that the Plan Administrator should have consulted a vocational rehabilitation expert.

The district court adopted the Report and Recommendation after considering the parties' objections and responses and their briefed arguments about the effect of the Supreme Court's intervening decision in Metropolitan Life Insurance Co. v. Glenn, --- U.S. ----, 128 S. Ct. 2343 (2008). See Holland v. Ret. Plan of Int'l Paper Co., No. 05-1095, 2008 WL 4163089, *6 (W.D. La. Sept. 4, 2008). The district court paid the Plan Administrator's decision a modicum less deference because of the apparent conflict that arose from International Paper's funding of the trust and its Senior Vice President's role as the Plan Administrator. Id. at *4. Substantively, the district court noted that "[a]lthough all of Defendant's medical reviewers concluded that Holland was capable of performing some occupation, none indicated what kinds of jobs Holland was capable of performing." Id. at *6. Discounting the two years that Holland worked as a dispatcher—a light duty job—because Doherty explained that all of the jobs for which Holland qualified were physically demanding, the district court found that "Holland has worked almost exclusively in heavy, labor

intensive work for over thirty years, which indicates that his skills are not transferable." Id. The court thus held that the Plan Administrator "could not have competently determined that there were jobs for which Holland was qualified by education, training, or experience without consulting a vocational expert" and that "[t]he Administrator's conclusion that Holland is not disabled is not supported by substantial evidence and is thus arbitrary and capricious." Id. As such, applying a modicum less deference, the district court held that the Plan Administrator abused its discretion and, consequentially, awarded Holland disability retirement benefits and attorney's fees. Id. at *7.

The Plan appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

The Plan appeals the district court's judgment. We review de novo the district court's judgment awarding disability retirement benefits, although we will set aside the district court's factual findings only if clearly erroneous. Crowell v. Shell Oil Co., 541 F.3d 295, 312 (5th Cir. 2008); Sweatman v. Commercial Union Ins. Co., 39 F.3d 594, 601 (5th Cir. 1994).

Under de novo review, we apply the same standard to the Plan Administrator's decision as did the district court. In this case, because the Plan undisputedly gives the Plan Administrator the discretionary authority to construe the Plan's terms and to render benefit decisions, we reverse the Plan Administrator's denial of benefits to Holland only if it abused its discretion. Stone v. UNOCAL Termination Allowance Plan, --- F.3d ----, No. 08-20254, 2009

WL 1479405, at *4 (5th Cir. May 28, 2009); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).[2]

A plan administrator abuses its discretion where the decision is not "'based on evidence, even if disputable, that clearly supports the basis for its denial.'" Lain v. UNUM Life Ins. Co., 279 F.3d 337, 342 (5th Cir. 2002) (quoting Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 299 (5th Cir. 1999) (en banc)). We reach a finding of abuse of discretion only where "the plan administrator acted arbitrarily or capriciously." Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d 211, 214 (5th Cir. 1999). "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." Id. at 215 (quotation marks omitted). Our "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end." Corry v. Liberty Life

---

[2] Typically, we employ a two-step process when conducting this review. Stone, 2009 WL 1479405, at *4; High v. E-Sys. Inc., 459 F.3d 573, 577 (5th Cir. 2006). First, we determine whether the Plan Administrator's determination was legally correct. Stone, 2009 WL 1479405, at *4. If the determination was legally correct, there is no abuse of discretion; if it was incorrect, then we must review whether that interpretation was an abuse of discretion. Id. Nonetheless, we are not confined to this test; we may skip the first step if we can more readily determine that the decision was not an abuse of discretion. Duhon v. Texaco, Inc., 15 F.3d 1302, 1307 n.3 (5th Cir. 1994); MacLachlan v. ExxonMobil Corp., 350 F.3d 472, 481 (5th Cir. 2003), abrogated on other grounds as recognized by Crowell, 541 F.3d at 311–12; see also Sweatman, 39 F.3d at 602–03 (concluding that an ERISA administrator's determination was not an abuse of discretion and affirming judgment on that basis without considering whether the administrator's determination was legally correct). The parties in this case have not conformed their arguments to our traditional two-step analysis, instead focusing only on whether the Plan Administrator abused its discretion in denying Holland benefits. Accordingly, we bypass, without deciding, whether the Plan Administrator's denial was legally correct, reviewing only whether the Plan Administrator abused its discretion in denying the claim.

Assurance Co. of Boston, 499 F.3d 389, 398 (5th Cir. 2007) (quotation marks omitted).

If the administrator has a conflict of interest, "we weigh the conflict of interest as a factor in determining whether there is an abuse of discretion in the benefits denial, meaning we take account of several different considerations of which conflict of interest is one." Crowell, 541 F.3d at 312 (quotation marks and footnotes omitted) (quoting Glenn, 128 S. Ct. at 2350–51); see also White v. St. Luke's Episcopal Health Sys., 317 F. App'x 390, 392 (5th Cir. 2009) ("[A] 'conflict of interest' . . . should 'be weighed as a factor' in determining whether an abuse of discretion occurred."). In addressing how such a conflict must be accounted for under an abuse of discretion review, the Supreme Court in Glenn eschewed "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." 128 S. Ct. at 2351. In particular, the Court held that weighing a conflict as a factor in the abuse of discretion analysis does not "impl[y] a change in the standard of review, say, from deferential to de novo review." Id. at 2350.[3] Quite simply, "conflicts are

---

[3] Previously, if we identified a conflict of interest, we would apply a "sliding scale" to assess the potential impact of the conflict. Lain, 279 F.3d at 343; see generally Vega, 188 F.3d at 298–99 (adopting a "sliding-scale" methodology of weighing conflicts of interest). "The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." Lain, 279 F.3d at 343. For example, "[w]hen a minimal basis for a conflict [was] established," we would "review the decision with only a modicum less deference than we otherwise would" under the abuse of discretion standard. Id. (emphasis in original, quotation marks omitted). Based on this precedent, the district court in this case applied a modicum less deference to the Plan Administrator's decision because of the existence of an apparent conflict of interest. See Holland, 2008 WL 4163089, at *4.

While this course of action was proper under our earlier precedent, the Supreme Court's holding in Glenn directly repudiated the application of any form of heightened standard of review to claims denials in which a conflict of interest is present. This supercedes our sliding-scale approach, which constitutes a change in the level of scrutiny. Nearly every other court of appeals to consider the sliding-scale approach or similar methodology in the wake of Glenn

but one factor among many that a reviewing judge must take into account."  Id. at 2351.

---

has concluded that Glenn supercedes such alterations to the abuse of discretion standard of review.  See, e.g., Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009) (holding that "in light of Glenn, our 'sliding scale' approach is no longer valid"); Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 358–59 (4th Cir. 2008) (holding that, under Glenn, "the consequence of [a finding of a conflict of interest] is not to modify the standard of review . . . but rather to consider the conflict as but one among many factors in determining the reasonableness of the [p]lan's discretionary determination."); Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1025 (9th Cir. 2008) (remanding for application of traditional abuse of discretion standard and consideration of a conflict as a factor in that review); Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1359–60 (11th Cir. 2008) (holding "that Glenn implicitly overrules our precedent to the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard" and that "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious"); Wakkinen v. UNUM Life Ins. Co. of Am., 531 F.3d 575, 581 (8th Cir. 2008) (relying on Glenn to hold that "the existence of a conflict did not lead the [Supreme Court] to announce a change in the standard of review" and that "[w]e are to review an administrator's discretionary benefit determination for abuse of discretion").  But see Weber v. GE Group Life Assurance Co., 541 F.3d 1002, 1010–11 (10th Cir. 2008) (holding that the sliding scale approach mirrors Glenn's approach).  We join the majority of courts of appeals in holding that after Glenn, we no longer apply a "sliding scale" standard of review.

Nonetheless, much of our "sliding scale" precedent is compatible with the Supreme Court's newly clarified "factor" methodology, and Glenn does not supercede that precedent to the extent it reflects the use of a conflict as a factor that would alter the relative weight of other factors.  See Vega, 188 F.3d at 296 (adopting the sliding-scale approach because it adheres to the use of a conflict as a factor in the abuse of discretion analysis); id. at 297 ("The existence of a conflict is a factor to be considered in determining whether the administrator abused its discretion in denying a claim."); Dunn v. GE Group Life Assurance Co., 289 F. App'x 778, 782 n.2 (5th Cir. 2008) ("The [Supreme] Court's treatment of the evaluator/payor conflict as merely one factor in the overall abuse of discretion analysis is more closely aligned with this court's 'sliding scale' approach than the Eleventh Circuit's 'presumptively void' standard.").

Thus, in this case, while the district court erred by altering its standard of review from a traditional abuse of discretion standard to the more onerous modicum less deference standard, it did not err to the extent it considered the purported conflict as a factor.  Here, we will consider the apparent conflict as one factor among the others identified by the parties in our de novo review of whether the Plan Administrator abused its discretion.

The parties dispute whether a conflict of interest exists in this case. The district court concluded a conflict existed because International Paper is responsible for funding the trust at viable levels and its Senior Vice President is the Plan Administrator that decides claims. Acknowledging that "the irrevocable funding of the trust diminishes the importance of the conflict and the likelihood that it affected the [Plan] Administrator's benefits decisions," the district court nonetheless concluded that the Plan "has not completely isolated benefits decisions from concerns regarding the viability of the trust." See Holland, 2008 WL 4163089, at *4.

Where, as here, the employer who funds the plan also determines eligibility for benefits, a structural conflict of interest exists. See Glenn, 128 S. Ct. at 2348.[4] Nonetheless, the specific facts of the conflict will dictate its importance. As the Supreme Court explained in Glenn:

---

[4] "Until recently, this bare assertion was insufficient to establish a conflict of interest claim"; yet, after Glenn, "we must take that conflict into consideration." Crowell, 541 F.3d at 311–12; see also Stone, 2009 WL 1479405, at *9 n.3 ("Metropolitan Life did, however, alter how this Circuit determines whether a conflict of interest exists."). In Burke, the Ninth Circuit explained:

> In light of [Glenn] . . . we disagree with those cases [that support the proposition that there is no conflict of interest when plan benefits are paid out of a trust] and hold that even when a plan's benefits are paid out of a trust, a structural conflict of interest exists that must be considered as a factor in determining whether there was an abuse of discretion. We reach this conclusion because, even though benefits are not paid directly by [the employer], [it] obviously still has a financial incentive to keep claims' experience [sic] under the [p]lan as low as possible—the less the [t]rust pays out as benefits, the less [the employer] will ultimately need to contribute to the [t]rust to maintain its solvency. Thus, although the impact may be less direct, there is nonetheless a close relationship between benefits paid by the [t]rust and the money [the employer] must provide from its general assets to fund the [t]rust.

544 F.3d at 1026.

> The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Id. at 2351.

Here, International Paper established the trust to pay benefits, and it makes periodic contributions to the trust. International Paper's contribution to the trust will necessarily increase if the total amount due on awarded claims exceeds the actuarially anticipated amounts. Nonetheless, International Paper's contributions are irrevocable and non-reversionary and the Plan's assets are not International Paper's assets. Thus, a decision to pay benefits does not directly affect International Paper's bottom-line. In effect, the creation of the trust diminishes, but does not entirely negate, the impact of that conflict. See Lance v. Ret. Plan of Int'l Paper Co., No. 08-1295, 2009 WL 1497493, *4 (4th Cir. May 29, 2009) ("Because the Plan's benefits are funded by a separate trust to which International Paper does not have access for its own purposes, the Plan does not have significant incentives to benefit itself by denying benefits." (quotation marks omitted)). In addition, the Plan has taken other steps to minimize any conflict. For example, although the Plan Administrator ultimately decides whether or not to award a claim, it submits applicants' records to independent medical professionals who have affirmed that they have no conflict of interest and that their compensation "is not dependent, in any way, on the outcome of

this case." Cf. Stone, 2009 WL 1479405, at *9 (discussing steps in a plan's attempts to mitigate a conflict, such as the fact that the administrator's compensation was not affected by the number of appeals granted or denied and the fact that the employer did not make any attempt to influence the administrative process). Holland adduced no evidence in this case that International Paper's conflict affected its benefits decision or that it has a history of abuses of discretion. See Glenn, 128 S. Ct. at 2351 (suggesting that conflicts carry greater importance where the "administrator has a history of biased claims administration"). Considering the totality of this evidence, we hold that, to the extent International Paper's funding of the trust and its Senior Vice President's role as Plan Administrator may create a conflict, that conflict is not a significant factor in this case. See Lance, 2009 WL 1497493, at *4 ("To the extent this type of plan structure creates any conflict of interest on the part of its administrator, that conflict may be deemed of such little importance as to recede 'to the vanishing point.'"(citing Glenn, 128 S. Ct. at 2351)).

Holland asserts two other considerations purportedly supporting the district court's conclusion that the Plan Administrator abused its discretion: (1) its reliance on Dr. Achilihu because he was a cardiologist, and (2) its decision to forgo consultation with a vocational expert. Neither argument has merit. The claim that the Plan Administrator abused its discretion by relying on a cardiologist is without legal merit or record support. So long as the Plan Administrator's decision is rationally related to the evidence, we do not require the Plan Administrator to credit a particular area of expertise when deciding on an applicant's prognosis. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) (While "[p]lan administrators . . . may not arbitrarily refuse to

14

credit a claimant's reliable evidence, including the opinions of a treating physician[,] . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."); see also Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001) ("[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary."). Indeed, "the job of weighing valid, conflicting professional medical opinions is not the job of the courts; that job has been given to the administrators of ERISA plans." Corry, 499 F.3d at 401 (citing Gothard v. Metro. Life Ins. Co., 491 F.3d 246, 250 (5th Cir. 2007)); see also Elliott v. Sara Lee Corp., 190 F.3d 601, 606 (4th Cir. 1999) ("[I]t is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented.").

In this case, the Plan Administrator considered all of the records submitted by Holland. The physicians who concluded that he was not totally disabled included multiple internists, a pulmonary disease specialist, and a cardiologist. Holland did not supplement the record with other evidence in this case, nor can he point to evidence that the Plan Administrator failed to consider. The Plan Administrator was not legally obligated to weigh any specific physician's opinion more than another's and did not abuse its discretion by crediting, among others, a cardiologist.

The claim that the Plan Administrator abused its discretion by denying Holland's claim without consulting a vocational expert is also without merit.

ERISA does not require a Plan Administrator to seek consultation of a vocational expert. In Duhon, we stated that:

> [W]e will not hold that absent vocational rehabilitation evidence a plan administrator necessarily abuses his discretion in making a final determination of disability. Instead, we will allow the reviewing court to decide, on a case-by-case basis, whether under the particular facts the plan administrator abused his discretion by not obtaining the opinion of a vocational rehabilitation expert.

15 F.3d at 1309. There, we considered an ERISA-qualifying plan that defined disability by reference to the inability to perform "any job for which he . . . is, or may become, qualified by training, education, or experience." Id. at 1308. Three reviewing physicians concluded that the plaintiff had a permanent degenerative back condition that prevented him from returning to work as a truck driver, but one of the physicians also concluded that the plaintiff was capable of "sedentary to light work." Id. at 1304. Based on these medical reports, the administrator concluded that the plaintiff was not permanently disabled and denied him benefits. Id. at 1308. After the district court granted summary judgment to the plaintiff, holding that there was insufficient evidence to support this conclusion without the opinion of a vocational rehabilitation expert, we reversed the district court and deferred to the administrator's decision. Id. at 1304; accord Elliott, 190 F.3d at 608 (holding that the administrator "was under no obligation to secure additional vocational evidence" and that the plaintiff "was free to supplement the record" with additional vocational information); Block v. Pitney Bowes Inc., 952 F.2d 1450, 1455 (D.C. Cir. 1992) (holding that "[n]o provision"

of the plan required the administrator to "ensure the availability of an alternative job").[5]

Here, no provision of the Plan requires the Plan Administrator to identify or ensure the availability of other suitable employment. As in Duhon, the Plan only requires that the Plan Administrator ensure that the applicant is capable of performing any occupation or employment for which he is qualified by his education, training, or experience. Ample record evidence supported the Plan Administrator's denial of benefits without the necessity of obtaining a vocational rehabilitation expert. It is undisputed that the Plan Administrator was entitled to conclude that Holland is capable of performing light to sedentary work based on the records submitted by Dr. Sonne, Dr. Fraser, Dr. Achilihu, and Dr. Calhoun. The Plan Administrator did not abuse its discretion in concluding that Holland's training and experience rendered him capable of performing sedentary to light work. Holland previously served for two years as a dispatcher, which he admitted was light work. Although the district court may disagree with that classification, the Plan Administrator, not the district court, is in the best position to balance conflicting evidence about the occupational requirements of various positions with the applicant's employer and in the relevant community. Gothard, 491 F.3d at 250 ("We cannot say that [the administrator's finding that a job was available] is sustained by our experience or that it does not conflict with our own judgment of what is required of [the sedentary position] . . . . [The Plan]'s decision may not be correct, but we cannot say that it was arbitrary.").

---

[5] In fact, the requirement of consultation with a vocational expert is unique to the Social Security Act. See, e.g., Conley v. Pitney Bowes, 176 F.3d 1044, 1050 (8th Cir. 1999) (holding that "[t]his procedure . . . is the special creature of social security" and "has no relevance to" an ERISA case).

Overall, considering the potential conflict of interest as a minimal factor, the evidence is more than sufficient to support the Plan Administrator's exercise of its discretion against the challenges raised by Holland. Cf. Dutka ex rel. Estate of T.M. v. AIG Life Ins. Co., --- F.3d ----, 2009 WL 1800139, *2 n.6 (5th Cir. June 24, 2009) ("[I]n light of the evidence supporting the plan administrator's decision, the conflict of interest is not a 'tiebreaking' factor.").

## III. CONCLUSION

For the above-specified reasons, we REVERSE the district court's judgment awarding Holland benefits and attorney's fees and REMAND for entry of judgment in favor of the Plan. Costs shall be borne by Holland.